IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Jerry Randleman, et al.,                                    Case No. 3:06CV7049

        Plaintiffs,

    v.                                                              AMENDED ORDER

Fidelity National Title Insurance Company,

        Defendant.


This is a class action suit for recovery of money damages against a provider of title insurance to institutions making loans to homeowners.[1] Named plaintiffs are homeowner-borrowers who refinanced mortgages on their homes. Their lender obtained lender's title insurance from the defendant, Fidelity National Title Insurance Company [Fidelity].

Plaintiffs claim that the premium paid for the title insurance for the refinancing transaction exceeded the premium allowed by Ohio law, and they have been injured and wronged by defendant's failure to charge them a lower premium, as provided by such law. The plaintiffs assert this claim even though they were not named insureds under the title insurance policy.

This court has jurisdiction under 28 U.S.C. § 1332(d)(2)(A).

Pending is plaintiffs' motion for class certification pursuant to Fed. R. Civ. P. 23(a) and (b)(3). [Doc. 53]. For the following reasons, plaintiffs' motion will be granted.

---

[1] Plaintiffs sought declaratory and injunctive relief in Count I of their complaint. I ruled on that count in my November 17, 2006, order [Doc. 34], and it was dismissed. Defendant's motion for clarification [Doc. 75], relating to a reference in my subsequent class certification order [Doc. 73], is well-taken and is granted: my January 31, 2008, order [Doc. 73] herewith is amended to reflect that Count I for declaratory and injunctive relief has previously been dismissed. The January 31, 2008, order is otherwise unaffected.

## Background

Title insurance provides protection against loss from defects in title to real estate and unenforceability of mortgage liens, and "is an integral aspect of virtually every mortgage loan and refinance transaction." *Mitchell-Tracey v. United General Title Ins. Co.*, 237 F.R.D. 551, 553 (D. Md. 2006). The title insurance industry issues two kinds of policies: owner's policies and lender's policies.

An owner's policy protects the buyer from clouds on the title for as long as the property is owned; a lender's policy protects the lender against a challenge to the borrower's title and remains in effect only as long as the mortgage remains of record. The buyer pays for a lender's policy, but the lender is the beneficiary of and holds the policy.

At the closing of an initial purchase, the home buyer typically pays for both owner's and lender's title insurance policies. When the owner later refinances a mortgage, he or she buys only a new lender's insurance policy.

Fidelity, along with all insurers doing business in Ohio, is a member of the Ohio Title Insurance Rating Bureau (OTIRB). Pursuant to the Ohio Revised Code, every insurer must file its rates with the Ohio Superintendent of Insurance. O.R.C. § 3953.28. The OTIRB files a manual of rates with the Ohio Department of Insurance (ODI), setting forth the rates title insurers will charge for policies.

The rate manual is binding on title insurers operating in Ohio, and the filed rates listed for title insurance are mandatory. There are, however, certain discounted rates: under rules PR-9 and PR-10 of the Schedule of Rates.

The first of these, PR-9, captioned "Reissue of Title Insurance Rate Loan Policies," states:

> When the owner of land on which application is made for a Loan Policy has had the
> title to such land insured in said owner by an owner's title insurance policy issued

within ten (10) years of the date of the application for a Loan Policy, such owner shall be entitled to a reissue rate of seventy percent (70%) of the rate for original Loan Policy up to the fact amount of such Owner's Policy, *provided that the owner-applicant provides a copy of said Owner's Policy or such other information to enable the Insurer to verify the representations made*.  .  .  .

The other provision, PR-10, captioned "Title Insurance Rate For Refinance Loans," states:

When a refinance loan is made to the same borrower on the same land, the following rate will be charged for issuing a policy in connection with the new loan on so much of the amount of the new policy as represents the unpaid principal balance secured by the original loan; *provided the Insurer is given a copy of the prior policy, or other information sufficient to enable the Insurer to identify such prior policy upon which reissue is requested*, and the amount of the unpaid principal balance secured by the original loan.  .  .  .

Ohio Title Insurance Rating Bureau, *Schedule of Rates for Title Insurance in the State of Ohio* (2003) (emphasis supplied).[2]

The plaintiffs refinanced the mortgage on their Ohio home in February, 2004. Their lender purchased a lender's title policy from NETCO Title Agency, an agent of Fidelity. The cost of the policy was charged to the plaintiffs as part of the settlement at closing; they paid a non-discounted rate for their 2004 lender's policy.

Because plaintiffs had purchased a title insurance policy for their prior loan within the ten-year look-back period of the 2004 refinancing, the Randlemans believe they satisfied the rate manual preconditions and qualified for a discounted reissue rate. They allege that, as a result of their transaction with Fidelity, they were overcharged $213.57.

The Randlemans have sued Fidelity on behalf of all homeowners in Ohio who, at any time

---

[2]

PR-9 and PR-10 became effective February 1, 2002. If a refinance transaction was completed prior to that date, the corresponding refinance rate provisions were § 8 and § 9, respectively.

Section 8 provided that the reduced rate was available "as long as there exists on owner's policy" and [e]vidence of the former policy must be shown." Section 9, likewise, required that "[e]vidence of the former policy must be shown" to receive the reduced rate.

from February, 15, 2000[3] to the present: 1) were required to pay a premium to Fidelity for title insurance acquired in connection with a refinancing transaction; 2) qualified for a discounted reissue rate pursuant to the rate schedule filed by Fidelity with the ODI; and 3) did not receive such discounted reissue rate. They claim that Ohio law obligated Fidelity to charge a discounted premium where Fidelity was issuing lender's policy title insurance as to individual residential properties that had been the subject of title insurance within the ten-year look-back period.

Fidelity moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [Doc. 5]. On November 17, 2006, I issued an order denying defendant's motion to dismiss with regard to the Randlemans' claims for breach of implied-in-fact contract and unjust enrichment. *Randleman v. Fidelity National Title Ins. Co.*, 465 F. Supp. 2d 812, 827 (N.D. Ohio 2007). That decision noted that plaintiffs' implied-in-fact contract claim depended on whether "all parties, including Fidelity, knew that plaintiffs, as the borrowers, were to be charged for, and would pay, the premium. If so, and if Fidelity overcharged for the premium [while concurrently not informing plaintiffs that they qualified for the discount], plaintiffs may prevail on their claim of breach of an implied-in-fact contract." *Randleman, supra*, 465 F. Supp. 2d at 819. I also concluded that plaintiffs' complaint stated a cause of action under Ohio law for unjust enrichment, in that they were alleging that: 1) they had conferred a benefit on the defendant; 2) the defendant knew of the benefit; and 3) the defendant retained the benefit under circumstances where it is unjust to do so. *Id*. at 824-25.

I now address plaintiffs' motion to certify this action as a class action.

### 1. Class Action Certification

The Randlemans move for class certification on behalf of a Plaintiff Class defined as:

---

[3]

This date reflects the plaintiff class proposed by the Randlemans in their motion for class certification, which differs from the class period initially identified in the complaint.

All persons who (i) paid for title insurance issued by defendant Fidelity National Title Insurance Company in connection with the refinancing of a residential mortgage loan on property located in Ohio that was completed on or after February 15, 2000, (ii) were entitled to receive the "reissue" or "refinance" rate for title insurance pursuant to Section 8 or Section 9 of the Filed Rates (for transactions prior to February 1, 2002) or PR-9 or PR-10 of the Filed Rates (for transactions February 1, 2002 to the present), and (iii) paid more than the "reissue" or "refinance" rate for such title insurance.

Excluded from this Class are employees, officers and directors of defendant Fidelity National Title Insurance Company and its subsidiaries or affiliates.

The Randlemans allege that class certification discovery has established that Fidelity has systematically failed to pass along this discount despite knowledge that particular consumers are entitled to the discounted rate.

Fidelity opposes the motion to certify the proposed class. It argues that the issue of knowledge of the discount on the part of each individual class member would be determinative, and would require individualized adjudication of "as to the knowledge and practices of the particular lender, mortgage broker, agent, and borrower involved in the transaction" [Doc. 56 at 1], and thus, individual adjudication of each class member's claim. This contention, plaintiffs assert, misreads the order overruling the motion to dismiss with regard to the claims of implied-in-fact contract and unjust enrichment: "'Non-disclosure' by defendant," plaintiffs state, "or, for that matter, 'nonknowledge' of the discount on the part of the homeowner claimant - - is not an element of either cause of action." [Doc. 64 at 2]. Accordingly, plaintiffs assert, no requirement for individualized "mini-trials" will result from certifying the proposed class.

### Legal Standard for Class Certification

Rule 23 of the Federal Rules of Civil Procedure enumerates the requirements for certification of a class action. Deciding class certification under Rule 23 involves a two-step process. To obtain certification, the Randlemans "must first satisfy Rule 23(a)'s requirements of numerosity,

commonality, typicality, and adequacy of representation." *Coleman v. General Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002). Additionally, they "must demonstrate that the class fits under one of the three subdivisions of Rule 23(b)." *Id.* Here, the Randlemans seek class certification under Rule 23(b)(3), which requires the district court find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Rule 23 provides courts with necessary flexibility to certify a class and monitor its progress to ensure certification remains appropriate. In considering a motion for class certification, the court examines the criteria stated in Rule 23 only; review of the merits of the case is not appropriate. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974). A district court has considerable discretion in certifying class actions, but must exercise this discretion within the framework of Rule 23. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) .

When evaluating whether to certify the class, the court must conduct a "rigorous analysis" into whether the prerequisites of Rule 23 are met. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). This means that a class is not maintainable simply because the complaint repeats the legal requirements of Rule 23.  *In re Am. Med.*, *supra*, 75 F.3d at 1079. "'[I]t may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.'" *Id.* (quoting *Falcon*, *supra*, 457 U.S. at 160).

I must take the allegations of plaintiffs as true, with any doubts resolved in favor of certification. *See Cross v. National Trust Life Ins. Co.*, 553 F.2d 1026, 1029 (6th Cir. 1977); *Thompson v. Community Ins. Co.*, 213 F.R.D. 284, 291 (S.D. Ohio 2002). Although I may, and often

a court must, look beyond the bare pleadings in the case, I may not examine the merits of the parties' claims or defenses. *Garrish v. United Auto., Aerospace, and Agricultural Implement Workers of America*, 149 F.Supp.2d 326, 330 (E.D. Mich. 2001) (citing *Eisen*, *supra*, 417 U.S. 156, 178 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.") (internal quotation omitted)). Indeed, I am guided by Judge Cole's recent Sixth Circuit decision, where the court stated

> Rule 23 does not require a district court, in deciding whether to certify a class, to inquire into the merits of the plaintiff's suit. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); *Daffin v. Ford Motor Co.*, 458 F.3d 549, 553 (6th Cir. 2006).

*Beattie v. CenturyTel, Inc.*, 2007 WL 4386197, at *4 (6th Cir. Dec. 18, 2007).

### Discussion

Class action relief is "peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class." *Falcon*, *supra*, 457 U.S. at 155 (internal quotation omitted). A class action "saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23." *Id.* (internal quotation omitted).

The Randlemans seek certification of a class consisting of individuals in Ohio who, within ten years of having purchased title insurance, refinanced the underlying mortgage and were charged a premium exceeding the applicable discount on file with the ODI. They contend that Fidelity engaged in the illegal practice of systematically charging refinancing borrowers non-discounted

premiums instead of the lower reissue rates on file. They further contend that they meet the legal requirements for certification under Rule 23 and that a class action is the most efficient mechanism to adjudicate these claims.

Fidelity's numerous objections to certification focus primarily on the alleged need for individualized factual determinations and the likely management difficulties.

### 1. Class Certification Analysis

Class certification is a useful tool which can increase the efficiency of the legal process, and economize judicial resources. In cases with common questions of law and fact, aggregation of claims into a class action may overcome "the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (internal quotation omitted). Moreover, the Supreme Court has noted that "[w]here it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device." *Deposit Guaranty Nat'l Bank of Jackson, Mississippi v. Roper*, 445 U.S. 326, 339 (1980).

I will evaluate each prerequisite for certification in turn.

### A. Numerosity

Plaintiffs must establish that the "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is not measured by a strict numerical test. *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006). Courts consider the number of prospective class members and several other factors related to the practicality of joinder, including "avoidance of multiplicity of actions, geographic dispersment of class members, size of individual

claims, financial resources of class members, and the ability of claimants to institute individual suits.

. . ." 1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 3:6, at 251 (4th ed. 2002).

Further, substantial numbers usually satisfy the numerosity requirement. *See In re Am. Med.*, *supra*, 75 F.3d at 1079; *Taylor v. CSX Transp.*, 2007 WL 2891085, at *3 (N.D. Ohio 2007). According to the Randlemans, Fidelity's records indicate that 94,000 lender's policies were issued by Fidelity in Ohio over the class period; it appears that the members of the proposed Plaintiff Class number in the tens of thousands. Consequently, this number of class members is sufficient to satisfy the numerosity requirement of Rule 23(a). *See Daffin*, *supra*, 458 F.3d at 552 (under the facts presented, thousands of class members met numerosity requirement).

### B. Commonality

The claims of the class members must share common legal and factual issues. However, the commonality requirement does not require that all class members share identical claims and facts. *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988). Rather, "'there need be only a single issue common to all members of the class.'" *In re Am. Med.*, *supra*, 75 F.3d at 1080 (quoting  *Newberg on Class Actions* § 3.10, at 3-50 (3d ed. 1992)). The single common issue, however, must be "a common issue the resolution of which will advance the litigation." *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998).

The pertinent facts and applicable law at issue in this case are common to all members of the proposed class. The Randlemans' claims concern whether they were eligible for and entitled to the discounted rate under Fidelity's filed rates, whether they failed to receive that rate as a result of Fidelity's systematic wrongdoing, whether Fidelity was unjustly enriched, and whether they sustained damages. These issues and questions are shard by all members of the proposed class and

are identical in all material respects.

Through affidavits of agents, lenders, and mortgage brokers as well as title agent disclosure documents, Fidelity represents that agents have expressly disclosed the refinance discount to homeowners refinancing their mortgages. Defendant argues that borrowers had knowledge or should have had knowledge of the discount rates, and they indicate that they will assert defenses as to the knowledge each plaintiff had prior to their transactions with Fidelity.

I understand that defendant believes it has defenses to apply to individual plaintiffs; however, these affirmative defenses do not destroy commonality. Class members still share legal and factual issues, and it is likely that many of Fidelity's proposed defenses will be asserted against a large number of the plaintiffs. *See Mitchell-Tracey*, *supra*, 237 F.R.D. at 557. Fidelity also argues that the Sixth Circuit has rejected class certification in analogous cases based on the lack of commonality under Rule 23. Defendant brings to my attention my 2003 decision *Lichoff v. CSX Transp., Inc.*, 218 F.R.D. 564 (N.D. Ohio 2003), and the discussion that class certification is improper when there are "material variations in the nature of the misrepresentations made to each member of the proposed class." In *Lichoff*, my decision was based upon factors unique to that case. There I noted:

> the lack of common issues in this case, combined with the prospect of working with and applying the law of at least sixteen states for one claim, and six of those states for the other, make the case inappropriate for class certification.

*Id.* at 574.

In this case, however, there are not "material variations" of the kind found in *Lichoff*. Instead, here, as in *Mitchell-Tracey*, "[t]he existence of routine and standardized practices giving rise to numerous claims weigh in favor of finding commonality, as well as typicality." 237 F.R.D. at 557.

### C. Typicality

10

Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." A claim meets the typicality prerequisite if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Newberg on Class Actions*, *supra*, § 3:13, at 328. *See also In re Am. Med., supra*, 75 F.3d at 1082 (quoting *Newberg on Class Actions* § 3.13, at 3-76 (3d ed. 1992)).

A representative party's claims, however, need not be absolutely identical to those of the potential class members. *See Senter v. General Motors Corp.*, 532 F.2d 511, 524 ("[t]o be typical, a representatives's claim need not always involve the same facts or law, provided there is a common element of fact or law"). As stated in *In re Telectronics Pacing Systems, Inc.*, 164 F.R.D. 222, 228 (S.D. Ohio 1995) (citation omitted):

> A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory . . . . The typicality requirement may be satisfied even if there are factual distinctions between the class members and those of other class members.

Here, the claims asserted involve common issues of fact and law. The facts underlying the Randlemans' claim are typical as to the proposed class; namely, that prior to a refinancing transaction each plaintiff had, within the ten-year look-back period, purchased either a prior lender's policy or a prior owner's policy with respect to the property at issue. Further, each class member will pursue a common legal theory. On behalf of the proposed class, the Randlemans' assert that they were legally entitled to the discounted rate, but, as a direct result of Fidelity's acts and omissions, the Randlemans and all potential class members did not receive the discounted rate.

I recognize Fidelity's objection that each plaintiff of the proposed class conducted his or her

11

refinancing transaction with a different local agent. This argument, however, is not persuasive; in this case, the plaintiffs complain about a widespread custom and practice on the part of the defendant's agents that denied them and all others in the proposed class the benefits of the discounted rate. Their claims, and the claims of the class members, arise from the same course of conduct by Fidelity, and all of the claims are based on the same legal theories. Further, the Randlemans' and the claims of the other class members do not need to be factually indistinguishable in order to meet the requirement of typicality. *See Senter*, *supra*, 532 F.2d at 524. Accordingly, the Randlemans have satisfied the typicality requirement.

### D. Adequacy

Rule 23(a)(4) requires that the representative parties fairly and adequately represent the class. "This prerequisite is essential to due process, because a final judgment in a class action is binding on all class members." *In re Am. Med.*, *supra*, 75 F.3d at 1083 (citing *Hansberry v. Lee*, 311 U.S. 32, 41 (1940)). The Sixth Circuit has articulated two criteria for determining the adequacy of representation: "'1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *Id.* (quoting *Senter*, *supra*, 532 F.2d at 525).

The adequacy factor under Rule 23(a) "serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem*, *supra*, 521 U.S. at 625-26 (internal quotation marks and citations omitted). The Randlemans' interests are aligned with those of the proposed class members. They have no interest in opposition to the class and there is nothing that leads me to believe that class members are antagonistic with each other or

12

with the goals of this litigation. Further, the Randlemans are thoroughly aware of the facts of this litigation and clearly have a stake in the outcome of this case.

The Randlemans and the potential class members suffered the same injury. Accordingly, there is every reason to believe that the Randlemans will vigorously prosecute the interests of the class. After reviewing the qualifications of the Randlemans' counsel, I find that they are competent and experienced with class action and complex litigation. They are well qualified to handle this type of litigation. Thus, I conclude that the Randlemans can provide fair and adequate protection of the interests of the class members.

### E. Rule 23(b) Requirements

The Rule 23(b) inquiry focuses on whether the individual claims of the class members overwhelm the claims of the class as a whole and whether, considering all of the factors, class treatment is superior to other forms of adjudication to resolve such claims. Rule 23(b)(3)'s "predominance" inquiry tests "whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, *supra*, 521 U.S. at 623. The Supreme Court has emphasized that the predominance criterion of Rule 23(b)(3) is "far more demanding" than the commonality requirement of Rule 23(a). *Amchem*, *supra*, 521 U.S. at 624. Further, in judging if a class action is superior to the other available methods for the fair and efficient adjudication of the controversy, I must examine "the difficulties likely to be encountered in the management of a class action[,]" which encompasses "the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen*, *supra*, 417 U.S. at 164.

Fidelity argues that the Randlemans cannot show that any common issues predominate over dispositive individualized issues and that class action is not the superior method of resolving the

13

Randlemans' claims.

As guidance in determining whether a class satisfies the requirement of Rule 23(b)(3), the Rule provides four factors that a court should consider: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

In the instant case, the four considerations weigh in favor of class certification. As to factor (A), the relatively small amount of individual damages[4] and the similarity of the claims give individual class members little interest in controlling the prosecution of separate actions.

Factor (B) – other litigation – does not appear to be at issue. While a case is proceeding in Ohio against one of Fidelity's sister companies involving title insurance overcharge claims, there appears to be no other litigation by or against members of the proposed class involving the allegations in this controversy.

Factor (C) – concentration of these claims in this court – favors certification. The most practical means for potential class members to obtain recourse against Fidelity is a class action. Concentration of all claims will streamline resolution and conserve judicial and litigation resources.

Finally, as to factor (D) – problems of case management. To be sure, the proposed class may include several thousand members; nevertheless, potential difficulties of case and class management should not result in denying classification. As in *Mitchell-Tracey*, Fidelity "contend[s] that the

---

[4] Based on evidence provided by the Randlemans, damages in this case are likely to range from around $40 to $500 per class member.

14

structure of the title insurance business and the normal course of business within the industry make it difficult, if not impossible, to search the policyholder files to determine who may have been eligible for the discounted reissue rate." *Mitchell-Tracey*, *supra*, 237 F.R.D. at 560. There, however, Judge Davis found data collection to be both possible and readily available. Although the task may indeed be laborious, I agree with Judge Davis that this should not deny certification. To do otherwise would deprive persons who could, as the Randlemans have, assert viable claims of their ability to recover funds that, according to the Randlemans, should never have come into Fidelity's hands, and should be returned to them.

The task of determining whether these claims have merit has, to some significant extent, been adjudicated by my ruling on the motion to dismiss. What remains, even if Fidelity presents a further challenge to the viability of the causes of action by way of a summary judgment motion, is, if plaintiffs overcome such challenge, creation and implementation of a mechanism for identifying and notifying class members, determining the amount of their loss, and entering judgment in their favor. These will no doubt be time consuming and expensive undertakings, but they are far from unknown to the federal courts. Certainly, standing alone, these tasks, which, from my judicial standpoint, are essentially managerial and manageable, are no basis for letting Fidelity – if its wrongdoing is established definitively – keep monies that it never should have gotten.

### 1. Common Questions of Fact and Law Predominate

#### a. Ambiguity in the Language of the Schedule of Rates is a Common Question

As addressed in the Background section, an applicant must satisfy preconditions in order to qualify for a refinance discount. The Randlemans' allege that Fidelity applied their filed rates in a

non-uniform and discriminatory fashion. They contend that this is because the language employed by PR-9 and PR-10 is ambiguous.[5]

PR-10, the rate rule that applies when the prior policy is an lender's policy, provides that "[w]hen a refinance loan is made to the same borrower on the same land," the insurer will charge a discounted premium for "issuing a policy in connection with the new loan" upon certain conditions, namely: 1) a current lender's policy is in force on the property; 2) the current lender's policy was issued in connection with a loan that has been outstanding for ten years or less; and 3) "provided the Insurer is given a copy of the prior policy, or other information sufficient to enable the Insurer to identify such prior policy upon which reissue is requested. . . ."

The Randlemans argue that they satisfy PR-10 because they had purchased a title insurance policy within the look-back period, and this prior transaction was reflected in the chain of title for their property. They claim defendant knew or should have about their prior transaction as a result of the title examination it performed, and that this information was "sufficient" to allow Fidelity to identify the prior policy.

Fidelity counters that the Randlemans' rely on a presumption that the prior lender will have obtained a lender's policy in every prior mortgage transaction, as opposed to an attorney opinion letter or title guarantee, or simply relying on a title commitment or a search abstract as sufficient evidence of clean title. Defendant claims that lenders often forgo a lender's policy for cost reasons

---

[5]

In my analysis I examine the language of PR-10. PR-9 states that an owner is entitled to a discount "provided that the owner-applicant provides a copy of said [prior] Owner's Policy or such other information to enable the Insurer to verify the representations made." The phrase "such other information," like the phrase "other information" in PR-10, is undefined; accordingly, my examination of the ambiguity of that phrase in PR-10 is applicable to PR-9.

and instead rely these other means instead. Only a prior insurance policy qualifies for the refinance discount; the rate rules do not allow for a discount on the basis of these other guarantees.

Fidelity also argues that, in my 2006 order, I did not accept the "presumption" that a prior mortgage equals a prior lender's policy and I refused to erase the preconditions from the rate rules. Defendant contends that the language of the rules is very important, and that if all the lenders or mortgage brokers had to do was place the order for the lender's policy, then the provisional language of PR-9 and PR-10 would be meaningless.

To determine if the alleged ambiguity in the Schedule of Rates is a common question, I must resolve whether the policy term "other information" in Fidelity's rate manual is ambiguous.

In *Dubin v. Sec. Union Title Ins. Co.,* 162 Ohio App.3d 97 (2005),[6] the trial court had denied plaintiffs' motion for class certification, finding that any common issues did not predominate over the significant individualized issues and that the case would be unmanageable as a class action. On appeal, the appellate court reversed this decision, holding that the trial court had improperly engaged in a merits determination in denying class certification. *Id.* at 101. The appellate court said "[t]here are valid disputes as to who must provide the copy of the former policy or the manner in which the policy is to be obtained by [defendant]." *Id.* at 102. I find this reasoning persuasive.

Rate filings are intended to be uniform, and all Ohio residents are entitled to have the same interpretation of the rate manual apply to them. I understand that this is not always the case. In Ohio, some agents employ a liberal application of the rules. They apply the discount if they see the loan was in the chain of the title from an institutional lender, and, even though a HUD-1 does not indicate

---

[6] Class certification in Ohio is based upon Rule 23 of the Ohio Rules of Civil Procedure. The Ohio rule is identical to Rule 23 of the Federal Rules of Civil Procedure.

the prior underwriter, they recognize a HUD-1 settlement statement from a prior transaction as constituting information sufficient to identify the prior policy.

The language of the rate rules is of great importance and because the terms can be, and have been, reasonably interpreted to support either plaintiffs' or Fidelity's position, I conclude that the rules are ambiguous. The phrase "provided the Insurer is given" is passive and resists identifying the actor, and the phrase "other information" as used in PR-10 is not defined in the filed rates. Moreover, the language of the prior provisions, § 8 and § 9, applicable to refinance transactions completed prior February 1, 2002, required only that "[e]vidence of the former policy" be shown.[7]

However I finally interpret this language, my ruling will apply to all members of the proposed class.

### b. Waiver is a Common Question

As indicated in my 2006 order, the issue of waiver is available to plaintiffs' to address Fidelity's argument that, in order to have been entitled to the discount, each class member had to have presented Fidelity with a copy of a prior policy or "other information" indicating that a prior policy had been issued within the look-back period. In that order I stated that

> [u]nder these circumstances, it is at least arguable that the defendant
> waived any right, as may have been provided to it under the

---

[7]

It would seem likely that this language should be read to fulfill the purpose of the provisions. And that purpose appears to be to give homeowner the financial benefit of the discount. If read that way, the language would support plaintiffs' contention about the lack of a duty to provide the former policy *sua sponte*. Certainly, if homeowners were told about, or otherwise were in fact aware of the discount, it is difficult to see why they would not have taken advantage of it. Consumers rarely, if ever, knowingly put or leave money on the table for insurers to pick up.

18

> Regulation, to confirmation that a prior policy had issued. Defendant has not argued why it should be that a *de facto* uninformed borrower can be held to perform a condition precedent where the insurer, presumptively well informed about all applicable regulations, declines to inquire of the lender or borrower, or otherwise ascertain whether a prior policy was issued within the ten-year period.

*Randleman*, *supra*, 465 F. Supp. 2d 820. Accordingly, waiver is another common question that predominates among all potential class members.

### c. Individualized Issues

Fidelity argues that the Randlemans' claims do not predominate over questions affecting only individual members. Defendant claims that my 2006 order made the issues of disclosure and knowledge of the refinance discount pivotal to the Randlemans' claims. For this reason, defendant repeatedly asserts that mortgage brokers know about the discount and that the discount is routinely given; in sum, that it is not hidden and that the title insurance industry is not nefarious. Defendant requests I take a close look at the ample documentation it provides, including order forms obtained from Fidelity agents evidencing brokers' and lenders' knowledge of refinance discounts, and affidavits from agents attesting to the fact that lenders had specific knowledge of the refinance discounts. Fidelity stresses that the issue of disclosure of the discount is an individualized issue that would require separate inquiries into the disclosure practices of each agent.

In all relevant respects, Fidelity's procedures for selling title insurance appear uniform throughout the state. Sales are accomplished through affiliate offices, and Fidelity distributes to affiliated agents underwriting manuals, endorsement manuals, rate manuals, and title insurance rate schedules and rate cards. Agents of Fidelity must follow an official routine when they receive orders for title insurance from customers, including: 1) compiling relevant historical data on the property; 2) preparing or reviewing title insurance commitments identifying prior mortgages; 3) determining

19

the premium charge for the title insurance; 4) sending reports to Fidelity informing Fidelity of the rate charged; and 5) issuing the title insurance policy.

Rule 23(b)(3)'s inquiry is demanding and contains the "stringent requirement that common issues 'predominate' over individual issues." *In re Am. Med.*, *supra*, 75 F.3d at 1084 (quoting *Newberg on Class Actions* § 3.10, at 3-56 (3d ed. 1992). Both plaintiffs and defendant extensively argued the issue of predominance through briefing and the class certification hearing. I find the issues of ambiguity and waiver are common to the entire class, and the Randlemans' cause of action arises out of an alleged course of conduct that is common with respect to all potential plaintiffs. These issues predominate the individualized issues raised by Fidelity. When viewed in its totality, common questions of fact and law represent a significant aspect of the case. The Randlemans satisfy the predominance requirement.[8]

### 2. A Class Action is a Superior Method for Adjudicating the Overcharge Claims

A plaintiff must also show a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

Class actions have been found superior when potential damages might be too insignificant to provide class members with incentive to pursue a claim individually, and where potential plaintiffs might not be aware of their rights or be able to hire competent counsel to protect these rights. *Amchem*, *supra*, 521 U.S. at 617. As damages are likely to range from under $100 to over

---

[8] Knowledge on the part of the homeowner is, as defendant contends, a fair and proper question. I am inclined, though, to take the view that any homeowner who did not get the discount lacked knowledge. As noted in the preceding footnote, it is simply contrary to human experience – and the human impulse – to throw away, rather than hang on to, one's money, and to contend that any homeowner with knowledge decided to forego the discount. Adopting this viewpoint will eliminate the need for individual determination of whether the homeowner knew about the discount.

20

$500 per class member, the potential recovery for the proposed plaintiffs does not give sufficient incentive for members of the proposed class to bring their own claims. *See, e.g.*, *Carroll v. United Compucred Collections, Inc.*, 399 F.3d 620, 625-26 (6th Cir. 2005). The alternative to a class action, individual lawsuits, would be an ineffective remedy for the class members and an unnecessary burden on the judiciary.

As an initial matter, I am not, as earlier comments suggest, persuaded at this point that the issues to which defendant points as undercutting class certification in fact do so. There appear to be four steps from here to the final outcome: 1) confirming the viability of either or both plaintiffs' claims [which may or may not require further motion practice]; 2) identifying the members of the class; 3) computing the difference between the amount charged and the discounted amount; and 4) and arranging for payment to the class members.

It appears likely that files in Fidelity's possession, or that of its agents, contain the information about the homeowners who did not get the benefit of the discount. While digging out that information may be very costly and time-consuming, that is no reason for letting Fidelity keeping monies which, if plaintiffs prevail, it should never have gotten.[9]

I am not persuaded that these steps cannot be taken, and the remaining issues – even assuming that I have overlooked important issues that will have to be resolved – cannot reasonably be managed or that whatever problems lie ahead outweigh the benefits of resolving  this case as a class action. *See, e.g., Mitchell-Tracey*, *supra*, 237 F.R.D. at 560.

---

[9]

Is the borrower of a book relieved of returning or paying for it, simply because he claims he cannot find it or, alternatively, the library does not know where he put it?

21

In any event, the plaintiffs should be afforded the opportunity to demonstrate that the problems and challenges that lie ahead, whatever they may be, can be overcome with creative and innovative approaches to class action management. I am confident, in any event, that certification is highly unlikely to result in the 94,000 mini-trials.

In sum, I reject Fidelity's assertion that a class action is not the superior method for resolving the Randlemans' claims. In doing so, I note recent decisions by other District Judges who have reached the same result. *See Cohen v. Chicago Title Ins. Co.*, 242 F.R.D. 295, 301 (E.D. Pa. 2007) (holding class action to be "the fair and efficient method for adjudication" in overcharge case); *Woods v. Stewart Title Guaranty Co.*, 2007 WL 2872219, *3 (D. Md. Sept. 17, 2007) (stating "essential legal and factual issues are common to the class, predominating over any individual questions,"in case granting certification to class of consumers alleging title insurance overcharge); *see also Mitchell-Tracey*, *supra*, 237 F.R.D. 551 (certifying a class of homeowners in title insurance overcharge case); *In re Coordinated Title Ins. Cases*, 2004 WL 690380 (N.Y. Sup. Ct. Jan. 8, 2004) (same); *Mitchell v. Chicago Title Ins. Co.*, 2003 WL 23786983 (Minn. Dist. Ct. Dec. 22, 2003) (same).

Class certification is appropriate under Rule 23(b)(3) as the fair and efficient method for adjudication because the essential issues, both factually and legally, are common to the class as a whole and predominate over any individual questions. It cannot be denied that "certification under this Rule is appropriate when settling the parties' differences in a single proceeding serves their interests by achieving 'economies of time, effort, and expense' and by promoting uniformity of decisions as to similarly situated class members without sacrificing fairness." *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492, 501 (D. Md. 1998 ) (quoting *Amchem*, *supra*, 521 U.S. at 615). Thus,

22

for purposes of Rule 23(b)(3), a class action is superior to other methods of adjudication. Indeed, it is likely that, in the absence of a class action, many members of the proposed plaintiff class will receive no adjudication of their claims.

**Conclusion**

I conclude that the interests of fairness, efficiency, and judicial economy are all best served by a class action. Certification in this case is important because each individual class member's claim may be small, resulting in a diminished incentive to sue to enforce his or her rights. Further, if Fidelity's course of action violated potential class members rights, many may not know of this violation. A class action lawsuit, therefore, is the most appropriate mechanism in this situation to advance the interests of the potential parties and to conserve the time and resources of the court. The proposed class meets the requirements of Federal Rule of Civil Procedure 23; accordingly I certify the class.

For the foregoing reasons, it is hereby

ORDERED THAT

1. Plaintiffs' motion for motion for class certification [Doc. 53] be, and the same is hereby granted;

2. Defendant's motion to clarify [Doc. 75] be, and the same hereby is granted.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge