IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Jerry Randleman, et al.,                      Case No. 3:06CV7049

         Plaintiff

        v.                                    ORDER

Fidelity National Title Insurance Co.,

         Defendant

This is a suit by persons who refinanced home mortgages who claim that the defendant Fidelity National Title Insurance Company [Fidelity] failed to give them a discount on title insurance in violation of Ohio law.

Pending is the defendant's motion to strike a report [and implicitly testimony] by plaintiffs' expert Alan Blocher. [Doc. 92]. For the reasons that follow, I deny the motion.

**Background**

Pursuant to Ohio law, Fidelity has filed Rate Schedules PR-9 and PR-10 with the Ohio Department of Insurance.

PR-9 provides for a discount on the charge for a lender's title insurance policy based on the existence of a prior owner's policy issued "within ten (10) years of the date of the application for a mortgage policy" and "provided that the owner-applicant provides a copy of said owner's policy

or such other information to enable the insurer to verify the representations made." PR-10 provides for a discount for a lender's policy in a refinance transaction based on the existence of a prior lender's policy. The discount is likewise based on the proviso that the insurer be "given a copy of the former policy and the amount of the unpaid principal balance secured by the original loan."

In essence, plaintiffs claim that during the course of refinancing their homes within ten years of having obtained an earlier mortgage, Fidelity failed to give them the benefit of the discounted premium as required under PR-9 and PR-10. They claim to represent a class of Ohio homeowners who likewise refinanced their homes with Fidelity without receiving the discount.

The policy underlying PR-9 and PR-10 is the likelihood that the work needed to issue a refinancing-related title insurance policy is less, and thus the cost to the issuer is less, where a prior policy was issued within ten years prior to refinancing.

Fidelity contends that PR-9 and PR-10 require refinancing homeowners either to provide a copy of a prior policy or give it actual reason to believe that they had obtained a policy during the earlier refinancing. Plaintiffs contend that all Fidelity had to know was that there was an earlier mortgage within the ten year period, and that that, alone, put Fidelity on notice of the existence of a prior policy, thereby triggering the obligation to give a discount for refinancing-related title insurance policy.

The Blocher report addresses, and answers affirmatively, the question:

> If a title company asked to insure title for a mortgage lender finds in the chain of title that an institutional mortgage lender had previously made a mortgage on the same property, which mortgage is still outstanding, should the title insurer for this refinance conclude that it is virtually certain that the prior lender had obtained a lender's title insurance policy?.

In essence, plaintiffs offer the Blocher report as proof that Fidelity knew, or reasonably should have known, that in nearly all instances of refinancing, the homeowner would have had to have obtained a title insurance policy. This, in turn, according to Blocher and the plaintiffs, provided, at least in effect and *de facto*, the notice required under PR-10 regarding the actual existence of a prior lender's title insurance policy. Such "notice," plaintiffs contend, triggered the discount mandated by PR-10.[1]

Implicit, if not explicit in Blocher's report is the view that someone in Fidelity's business necessarily had to be cognizant of and familiar with the commercial realities of mortgage refinancing during the period covered by this suit. As importantly, lenders, according to Blocher, routinely sold their mortgages, which, in turn, would be resold, often in a securitized form. Policies of title insurance were a prerequisite to those transactions: title insurance was part of the grease that made the wheels go round.[2] Thus, in light of commercial realities and common practices, the notice required by PR-10 [the focus of the Blocher report] need not, according to plaintiffs, have come from the homeowner. In their view, the requisite notice to trigger the discount arose simply from the fact of a prior mortgage within the ten year period.[3]

---

[1] As noted, absent a lender's policy within the ten year period, no discount is available. Likewise, without a prior owner's policy no discount is available under PR-9. *See, e.g., Chesner v. Stewart Title Guar. Co.*, No. 1:06cv00476 at 13 (N.D. Ohio Jan. 9, 2009) ("[T]he language of the Rate Manual simply cannot be read to exclude the requirement of an actual prior policy.").

[2] But not to keep the wheels from falling off. That they did so is a fact, albeit non-germane to this lawsuit and this opinion, as to which judicial notice appears appropriate.

[3] Fidelity notes that the Blocher Report does not speak to PR-9 and offers no opinion as to the frequency of prior owners' policies, or the extent to which Fidelity would have been on notice, *via* the overall commercial context, of the existence of a prior owner's policy. *See Chesner, supra*, at 5-6 (this Court holds "that whatever the merits of Plaintiffs' contention that a prior mortgage acts as a proxy for a prior title policy, such contention, even if it could be proven true, at best would establish the existence of a lender's policy. It does nothing to establish the

The Blocher report traces the history of the evolution of the home mortgage business. Historically, lenders and borrowers knew one another, and lenders retained ownership of the mortgages and collected the monthly payments until the borrower paid off the note. As time passed, and as federal agencies became increasingly active, the relationship between lender and borrower, and much else, changed.

According to Mr. Blocher, among these changes was the routine sale of mortgages by lenders. Whereas historically customs and practices had been local, as trafficking in mortgages became national, local usages became transformed into national practices and requirements. His report states: "[T]he need for standardization became more important. Mortgages had become commodities and thus needed to be as fungible as possible. An important part of that process was the requirement of title insurance. [Doc. 104-2, at 5].

Moreover, according to Blocher,

For the last 15 to 20 years, virtually every mortgage loan origination has had the secondary market in mind. Either the loan was transferred to another entity immediately or the option of a later sale was kept open. Since borrowers are the ones who bear the cost of title insurance it has become customary for lenders to require title insurance from a known company. . . .

Based on my experience, I reiterate my opinion that a title insurer for a refinance transaction can be virtually certain of the existence of a previous title insurance policy.

[*Id.*, at 6].

Blocher based his opinion on his having reviewed, during the course of a nearly fifty year career in and around the mortgage industry, "tens, if not hundreds of thousands, loan files traded in

existence of a prior owner's policy").

the secondary market." [*Id*.]. He further states that "I cannot recall any [loan file] that did not contain a title insurance policy." [*Id*.].

Defendant seeks exclusion of the Blocher report on the basis that Blocher: 1) never spoke with any lenders or lending institutions issuing loans in Ohio; 2) never spoke with or conducted a survey of institutions and individuals issuing title policies, title guarantees or attorney opinion letters in Ohio; 3) did not review the loan files of any of the class members. In support of its contentions, the defendant notes that a Judge of the Cuyahoga County, Ohio, Court of Common Pleas orally granted a motion to exclude a report by Blocher that in all essential aspects is the same as the report in this case. *Dubin v. Security Union Title Ins. Co.*, No. CV 03 496180.

The essence of defendant's challenge is, therefore, that while Blocher may have been speaking about how things are and have been on a national level, he is ignorant of mortgage practices in Ohio. In addition to not knowing about practices in Ohio, Blocher, in the defendant's view, simply failed to do his homework to find out whether his views had any applicability or relevance to the issues in this case. In other words, his conclusion that in this case Fidelity was or should have been "virtually certain of the existence of a previous title insurance policy" is unfounded, unsupported and unsupportable.

Fidelity has submitted extensive evidence that, at least in some areas and as to some lenders in Ohio, title insurance policies rarely play a role in mortgage financing. Instead, those lenders and lenders in those areas provide loans and have mortgages on the basis of title guarantees or attorney opinion letters. Thus, according to Fidelity, and contrary to Blocher's assumptions and conclusions, it could not have been "virtually certain" that any particular prior mortgage involved a policy of title insurance.

5

Plaintiffs did not provide any of the evidence obtained by Fidelity to Blocher. When asked on deposition, Blocher acknowledged that he had not tried to find out and did not know about any peculiarities in Ohio. He altered, however, his "virtually certain" estimate to express as a "general rule that 99 - - 90 to 95 percent of the cases [there] is going to be a lender's policy." [Blocher Dep. at 97-99, 112]. These figures were, he also acknowledged, a "guesstimate," which was not based a statistical analysis of any sort or on a "mathematical calculation." [*Id*., at 48, 53, 159].

The principal question raised by Fidelity's motion to exclude Blocher's report and testimony is whether, in light of Fidelity's evidence of Ohio practices and Blocher's failure to learn about and take those practices into account, his opinion as to what Fidelity knew or should have known is admissible. I conclude that it is, and that Fidelity's objections go to weight, not admissibility.

## Discussion

To be admissible under Fed. R. Evid. 702, opinion evidence must be based on reliable "scientific, technical, or other specialized knowledge." The Supreme Court set standards for assessing the admissibility of scientific opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 589-95 (1993). The Court applied *Daubert* principles to non-scientific opinion in *Kumho Tire Co v. Carmichael*, 526 U.S. 137, 149-50 (1999).

Unquestionably, Blocher's opinion is not based on scientific principles or standards. It originates, rather, in his fifty-year experience with and within the mortgage industry, and the roles he has played in the evolution of that industry. Among other experiences, he joined Countrywide Funding Corporation, which was to become "the largest volume originator of mortgage loans in the U.S." [*id*. at 3] as that company was being created. He also worked for the Federal Home Loan Mortgage Corporation ["Freddie Mac"] for eight years beginning in 1973. Then he was a Vice

6

President with Merrill Lynch, where he was responsible for various aspects of that company's mortgage transactions. [*Id*. at 8]. After two years with Merrill Lynch, he joined E.F. Hutton in 1985 for three years, where he was responsible for resolving problems at that firm's mortgage subsidiary as a result of a criminal fraud perpetrated against it. [*Id*. at 7]. Since 1988 he has worked as a private consultant to financial institutions "regarding complex mortgage issues." [*Id.*].

These experiences clearly qualify Blocher to speak with authority on national trends in the mortgage industry. Fidelity does not challenge his ability to do so. Instead, Fidelity focuses on his lack of inquiry, investigation and information about the mortgage industry in Ohio.

To some extent, Fidelity's challenge is based on the fact that Blocher has not produced any of the possibly hundreds of thousands of loan documents he purports to have seen over the years. The defendant does not claim Blocher did not see that many documents: it simply complains that Blocher has not produced any of them for its inspection and review.

I am not troubled by that fact. If at all material, the failure to produce any such documents goes to Blocher's credibility in describing his experiences. If the case goes to trial, the jury can make whatever use it cares to make about this contention. For now, I find no basis for excluding Blocher's opinions simply because he can't now reach back into files – many probably in the hands of others, even if presently accessible and retrievable – to produce any specimens or samples of what he saw and reviewed.[4]

---

[4] Defendant argues that it cannot respond to Blocher's report because he hasn't produced any of the materials he reviewed during the course of his career. I disagree: defendant certainly is free to produce evidence, probably through an expert, that undercuts Blocher's description of what he saw in standard mortgage documents used in transactions where mortgages were sold, or likely to be sold in the secondary market.

This is not, as defendant suggests, a defect in method. "Method," as used in *Daubert*, is not at issue here. What matters is whether Blocher appears to know what he's talking about – and its pertinence to the issues in this case. His reference to hundreds of thousands of loan-related documents relates simply to the basis for his opinion. To the extent that "method" might be pertinent, his work, which required him to review those documents, was his "method" for learning about how the mortgage industry evolved and what its accouterments became and are.[5]

Nor am I troubled by Blocher's overall ignorance about some aspects of mortgage-related practices in Ohio. It does not appear that the practices to which Fidelity points – including reliance by some lenders in some parts of this State on title guarantees and attorney opinion letters – are universal or extensive in the context of mortgage loans in general or loans offered into secondary markets specifically. I do not find Blocher's opinions about nationwide practices, and by inference, those in a segment [indeed, perhaps a large segment] of the Ohio mortgage industry to be so dubious as to justify excluding his report on the basis of unreliability. Fidelity can, and no doubt will highlight his ignorance about practices in Ohio as part of its likely contention that the jury should give no weight to Blocher's opinions.

---

[5] I agree with plaintiffs that decisions cited by Fidelity in challenging the basis for Blocher's opinions are distinguishable. In *KW Plastics v. United States Can Co.*, 131 F.Supp.2d 1289, 1292-93 (M.D. Ala. 2001), and *Lake Michigan Contractors, Inc. v. The Manitowoc Co., Inc.*, 225 F.Supp.2d 791, 792-93 (W.D. Mich. 2002), courts rejected opinions as to damages in specific circumstances, not opinions, as Blocher presents, about general practices in an entire industry on a national basis. In *Home Design Services v. Hibiscus Homes of Florida*, 2005 WL 2465020, *7 (M.D. Fla), the court excluded speculative expert testimony about buyers' preferences and which opinion was based on what others believed. Here, Blocher's opinions are based on what he has observed and learned in fifty years of professional work. His opinions are not, as those in *Home Design* were, "unsupported assertions." *Id.* at 6.

Contrary to Fidelity's contention, exclusion here is not required, as it was in *Lake Michigan Contractors, supra*, 225 F. Supp. 2d at 792-99, and *Home Design, supra*, 2005 WL 2465020, at *6-7. In those cases, the witnesses could not explain how they reached their estimates, which the courts concluded were speculative and inadmissible.

Here, in contrast, Blocher explains quite clearly how he reached his conclusions about the evolution of the mortgage industry and the development of national standards and requirements, and the basis for his opinions as to the operation of a secondary market for and securitization of mortgages. Most simply put: he was there, not just as a witness, but also, apparently, as a participant as some of the evolutionary trends developed. This is not a case in which it can be said, that the expert "supplies nothing but a bottom line." *Brainard v. Am. Skandia Life Assurance Corp*., 432 F.3d 655, 663-64 (6th Cir. 2005). In this case, he appears to have helped to write the bottom line – or, at least, assisted in its computation.

Fidelity argues, and correctly so, that plaintiffs have to show that the Blocher report applies to the facts of this case, which involves Ohio mortgage transactions. *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005); *see also Kumho Tire, supra*, 526 U.S. at 157 ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dexit of the expert").

Fidelity points to the various undisputed facts that Blocher 1) does not know what percentage of Ohio residential loans are sold in the secondary market; 2) is not aware of which Ohio lenders maintain their loans in their own portfolio and do not sell them in the secondary market; 3) "would not be surprised to hear" that numerous Ohio banks do not sell their loans into the secondary market; 4) doesn't know whether Ohio lenders who retain their loans may not obtain lenders' policies; and

9

5) says nothing in his report as to whether Ohio lenders regularly obtain lenders' policies when issuing loans. [Blocher Dep., at 166-67, 183-84]. Finally, when asked how many of the class members' loans at issue in this case were traded in the secondary market, Blocher conceded, "I haven't seen the loan files, so I have no way of knowing." *Id.* at 178.

I am not persuaded from the evidence produced by Fidelity that Blocher's opinions about the evolution and operation nationally of the secondary market for mortgages have such little applicability to Ohio that Fidelity's motion should be granted. Indeed, at this point, I am satisfied, solely for purposes of my ruling, that national practices are more likely than not generally, though not universally followed in Ohio. To the extent that they are, Blocher's opinions about the significance of those practices on what Fidelity knew or should have known are relevant and material. And sufficiently well-founded to be heard by the jury.

In sum, Blocher's ignorance about some aspects of the Ohio mortgage loan market and the extent to which Ohio lenders do not follow national practices goes to weight, not admissibility.

This is so, even if alternative evidence – namely, actual loan files – might, as defendant contends, be available to the plaintiffs. To the extent that they are available, but are not offered, the impact of Blocher's opinions might well be blunted. But that does not mean that it is inappropriate for the jury to learn Blocher's views about the growth, extent and operation of the secondary mortgage market and its reliance nationwide on title insurance policies in most transactions.[6]

---

[6] This certainly is evidence that is otherwise beyond the ken of the average juror, and which will be helpful to the jury. *See Ellison v. Empire General Life Ins. Co.*, 919 F.2d 140, 1990 WL 191630, * 4 (6th Cir.) (Unpublished Disposition) (expert need not have complete knowledge of defendant's practices to be able to assist the jury in understanding industry practices generally); *see also Ling Nan Zheng v. Liberty Apparel Co.*, 556 F. Supp. 2d 284, 293 (S.D.N.Y. 2008) (expert testimony re. "industry custom and historical practice"); *Payne v. Geico Indem. Co.*, 2002 WL 34439222, * 2 (W.D.Okla.) (testimony as to industry custom, practice and

This is not to say – one way or the other – that the Blocher report, without more, will or should be enough to get the case to the jury, or to sustain a jury verdict. Those are decisions for another day. All that is at issue here is whether the Blocher report and his anticipated testimony are sufficiently reliable for the jury's consideration, and for my consideration vis-a-vis the pending summary judgment motions.

The decision of the Common Pleas Judge in *Dubin* is not, of course, binding on me. In any event, evidentiary standards for admissibility of opinion evidence differ in our state courts from those applicable in this case under the Federal Rules of Evidence. Ohio Rules of Evidence 702, 703 and 705 differ from the similarly numbered rules in the Federal Rules of Evidence. *See, e.g., Ball v. Consol. Rail Corp.*, 142 Ohio App. 3d 748, 757 (2001) (stating that the language of Ohio's Rule 702 differs from that of its federal counterpart, even though the Ohio Supreme Court expressly adopted *Daubert*);  *State v. Malroit*, 2000 WL 1675046, at * 4 (Ohio App.) ("Ohio Evid. R. 703 differs from the federal rule.")*; Brokamp v. Mercy Hosp. Anderson*, 132 Ohio App. 3d 850, 863 (1999) ("Ohio's rule is diametrically opposed to Fed. R. Evid. 705"). As a result, the standards for admission in Ohio are more stringent than in federal court under Rule 702 and *Daubert*, which Fed. R. Evid. 702 codifies. Ohio Rule 702 is a pre-*Daubert*.[7]

Under Ohio R. Evid. 705, the expert must disclose the underlying facts supporting his opinion. Rule 705 of the Federal Rules contains no such requirement. *See Brokamp, supra*, 132 Ohio App. 3d at 864. Likewise, Ohio Rule 703 requires the expert to testify on the basis of facts either

---

experience of assistance to the jury).

[7] With regard to Ohio R. Evid. 702, there may be less difference in practice than appears from the test of the two rules: Ohio cases cite *Daubert*, rather than the *Frye* standard embodied in Ohio R. Evid. 702.  *See Ball, supra*, 142 Ohio App. 3d at 757.

11

perceived by the expert or admitted into evidence. No similar requirement is found in Fed. R. Evid. 703. *See, e.g., Lambert v. Goodyear Tire & Rubber Co.*, 79 Ohio App. 3d 15, 29-30 (1992) (explaining that Ohio's Rule 703 omits the second sentence of its federal counterpart, and provides that "the facts or data . . . [on] which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." The court added that the Ohio Supreme Court had recently re-examined Ohio's Rule 703 and created a "major part" exception to the rule.).

## Conclusion

For the reasons stated, I find Fidelity's objections to admission of the Blocher report and his likely testimony not well taken. The report, which describes the historical evolution on a national basis of practices in the mortgage industry, and how those practices have led to widespread and commonplace use of title insurance, is relevant to plaintiffs' contention that Fidelity knew or should have known that they had previously purchased title insurance and should have been given the discounted rate. Blocher's views may or may not be conclusive, or, to the jury, even persuasive. But that does not matter, as that is not the standard for admissibility under Fed. R. Evid. 702.

It is, therefore,

ORDERED THAT defendant's motion to exclude the expert report of Mr. Alan Blocher [Doc. 92] be, and the same hereby is overruled.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge